# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Arlander Keys | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4336 | **DATE** | 7/14/2004 |
| **CASE TITLE** | Wilfredo Cuevas vs. Jo Anne Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Memorandum Opinion and Order entered. Plaintiff's Motion for Summary Judgment [#25] is hereby **granted.** Commissioner's Motion for Summary Judgment [#31] is hereby **denied.** The matter is remanded to the Commissioner for further proceedings consistent with this decision. *AK*

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | **3** | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | JUL 15 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | 33 |
| ✓ | Mail AO 450 form. | | 7/14/2004 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| | courtroom deputy's initials FT *secy* | U.S. DISTRICT COURT CLERK 2004 JUL 14 AM 11: 35 Date/time received in central Clerk's Office | FT mailing deputy initials | |

WILFREDO CUEVAS,          )
                          )
          Plaintiff,      )
                          )
     v.                   )          Case No. 02 C 4336
                          )
JO ANNE B. BARNHART,      )          Magistrate Judge
Commissioner of Social    )          Arlander Keys
Security,                 )
                          )
          Defendant.      )

DOCKETED

JUL 1 5 2004

## MEMORANDUM OPINION AND ORDER

Wilfredo Cuevas, now 49 years old, suffers from severe back injuries, a foot injury, possible depression, asthma, and obesity. He alleges that these impairments, and the resulting chronic pain, prevent him from working. On April 4, 2000, Mr. Cuevas applied to the Social Security Administration, ("SSA") for Disability Insurance Benefits, but the SSA denied his application. After unsuccessfully pursuing an appeal through the SSA's processes, Mr. Cuevas filed suit in this Court seeking review of the Commissioner's decision to deny benefits. This case is before the Court on cross motions for summary judgment.

### Facts and Procedural History

On November 27,1999, Mr. Cuevas tripped and fell down a flight of stairs while working as a maintenance man for Draper & Kramer Management Company. Record at 349. Mr. Cuevas applied for

Disability Insurance Benefits on April 4, 2000. Record at 161. The SSA denied his claim initially on December 14, 2000, and upon reconsideration on March 23, 2001. Record at 82-85, 87-89. Mr. Cuevas requested a hearing before an administrative law judge ("ALJ"), and his case was assigned to ALJ Maren Dougherty, who held the requested hearing on November 21, 2001. Record at 16.

At the hearing before the ALJ, Mr. Cuevas, who was represented by counsel, testified first. In response to questions about his physical impairments, he testified that he experiences constant pain in his back, right leg, right foot, and left shoulder.   Record 39-40.  He testified that his back pain goes from the back of his head to his shoulder blades, and down to his waist, mainly on the left side; the pain also goes around to his front ribs.  Record at 58.   The pain in his right leg starts from the bottom of his heel and shoots up the back of his leg to his back. Record at 59.  He testified that his entire foot hurts, and walking on it causes it to swell. Record at 60. Mr. Cuevas testified that he suffers from chronic headaches that begin in the back of his head and continue all the way down his back. Record at 46.  Finally, he testified that he has had approximately three or four seizures total, but he could not recall the dates, and he testified that medication basically controlled that problem. Record at 56, 45.

Mr. Cuevas testified that, if he stands in one spot longer

than 5-10 minutes, he feels pain in both of his legs and in his back. Record at 36. Mr. Cuevas testified that he must use a cane while standing to prevent him from falling, because his legs shake and cramp. Record at 36. Although moving around is better than sitting or standing, Mr. Cuevas stated that he has difficulty walking due to two surgeries on his right foot to repair a ruptured tendon, pain in his left foot, and back pain. Record at 37. Mr. Cuevas testified that bending causes pain in his back and shoulder blades, and that walking up stairs causes pain in his back, his right leg, and his foot. Record at 38-39. He testified that, on a scale of one to ten, one being minimal pain and ten being severe enough to warrant a visit to the emergency room, his pain is, at its best, a six or a seven, and at its most severe, a nine. Record at 40.

Mr. Cuevas testified that, although Dr. Jesse Butler, his treating physician, recommended surgery, he decided against the procedure because Dr. Butler gave no guarantee that it would alleviate his pain. Record at 42-43. He testified that, within the last year, his back pain has become progressively worse. Record at 43. He testified that he received injections for his shoulder, which provided temporary relief; the injections controlled the pain for several months, but then the pain returned. Record at 62. Mr. Cuevas testified that, on average, he takes four Tylenol with codeine each day. Record at 62. On

days when the pain is particularly bad, he takes more, though he does so more because he wants to follow his doctor's orders because it does not really help. Record at 62-63. Mr. Cuevas testified that he also takes Advil and extra strength Tylenol, although those don't really help either. Record at 64.

In addition to his physical problems, Mr. Cuevas testified that he also suffers from depression, for which he is treated by Dr. Elie Mangoubi, a psychiatrist. Record at 48-49. Mr. Cuevas testified that he sees Dr. Mangoubi approximately every two weeks, and that Dr. Mangoubi prescribed sleeping pills, which, in Mr. Cuevas' opinion, do not really help with his depression. Record at 50. He testified that the depression makes him angry, frustrated, and causes him to forget things; occasionally he becomes sad and cries. Record at 50. He testified that his depression also contributed to the destruction of his marriage. Record at 50.

With respect to his daily activities, Mr. Cuevas testified that he takes pain medication and sleeps during the day to alleviate the pain. Record at 41. He testified that he takes one- to two-hour naps, two or three times a day. Record at 41-42. Because he is able to sleep only about three hours a night, he testified that he is tired during the day. Record at 42. He testified that he forgets things, he watches no TV, he does no chores, he has no hobbies, does no grocery shopping, he does not

drive a car, he does not visit friends.  Record at 47-48, 51-52.
When asked about his normal daily activities, Mr. Cuevas
responded that he is usually at home, alone, eating. Record at
51. Mr. Cuevas testified that the only thing he is able to do
without assistance is take care of his personal needs( bathing,
going to the bathroom, and dressing). Record at 51- 52.

After Mr. Cuevas testified, the ALJ heard testimony from Dr.
Daniel Schiff, a trained psychiatrist and medical expert ("ME").
Dr. Schiff testified initially that reports on Mr. Cuevas mental
impairments were inconsistent, and that he questioned the
diagnoses Mr. Cuevas had been given.  He testified that Mr.
Cuevas should not have been diagnosed with dementia, because Mr.
Cuevas had reported that he was conscious after the fall, which
would indicate very little damage to the brain. Record at 68.
Dr. Schiff testified that, although Mr. Cuevas later claimed he
lost consciousness after his fall, he believed Mr. Cuevas'
statement at the time of treatment was more credible. Record at
68.  Additionally, Dr. Schiff testified that, although on two
occasions Mr. Cuevas presented himself as unable to remember, on
other occasions he demonstrated that he was able to remember.
Record at 69. Dr. Schiff testified that these inconsistencies
caused him to doubt whether Mr. Cuevas actually suffered from
dementia. Similarly, Dr. Schiff testified that he questioned the
seizure disorder diagnosis, because Mr. Cuevas had a normal

electroencephalogram ("EEG") and because he did not experience seizures with the frequency required in the *Diagnostic & Statistical Manual of Mental Disorders.* Record at 69.

With respect to the depression, Dr. Schiff noted that Mr. Cuevas scored a ten on the depression inventory, indicating that any depressed symptoms were likely insignificant. Record at 70. Dr. Schiff recognized, however, that Mr. Cuevas did have a moderate level of anxiety. Record at 70.

Dr. Schiff also questioned the diagnosis given by Dr. Cuevas' treating psychiatrist, Dr. Mangoubi. Specifically, Dr. Schiff testified that the diagnosis- post traumatic stress disorder- requires a triggering life threatening trauma, and in Dr. Schiff's opinion, falling down 15 stairs without losing consciousness, would not qualify as such a trauma. Record at 70. Dr. Schiff also questioned why Dr. Mangoubi was treating Mr. Cuevas primarily for insomnia when Mr. Cuevas asserted that his sleep problems stemmed from his pain. Record at 71. Dr. Schiff also noted that codeine is a depressant, and that if Mr. Cuevas was taking pills containing codeine every two, six or eight hours, that could certainly cause his depression. Record at 72. Dr. Schiff testified that, although he was uncomfortable making any psychiatric diagnosis, he acknowledged that Mr. Cuevas was clearly suffering significantly with symptoms of depression. Record at 72. When asked if anger and frustration could be one

6

aspect of a depressive situation, Dr. Schiff testified that, while these symptoms could indicate many things, they could certainly be Mr. Cuevas' way of reacting to his depression. Record at 72.

After Dr. Schiff testified, the ALJ heard from Lee Knutson, a vocational expert. The ALJ asked VE Knutson to describe the skill and exertional demand of Mr. Cuevas' previous work. Record at 74. With respect to his job as a maintenance worker at a condominium complex, the VE stated that the position seemed to be more along the lines of a janitor, with some maintenance characteristics. Id at 74. The VE testified that he would consider the job to be semiskilled, normally performed at the medium level in terms of physical demand, but because Mr. Cuevas' job involved lifting up to 100 pounds, it would be classified as heavy in terms of physical demand. Record at 74. With respect to Mr. Cuevas' work as a pest controller, the VE testified that this job is classified as unskilled, and light in physical demand. But, he testified that, because Mr. Cuevas reported lifting up to 100 pounds or more in that job, he would classify it as heavy in physical demand. Record at 74. The VE testified that Mr. Cuevas' security guard job would be classified as a semiskilled job that is light in physical demand. Record at 74.

Next, the ALJ posed several hypotheticals to the VE to assess Mr. Cuevas' employability. Initially the ALJ asked the VE

to consider jobs that would be available for someone who: (1) is 44-46 years old; (2) has a GED; (3) has work experience as listed above; (4) can lift up to 20 pounds occasionally and 10 pounds frequently; (5) can sit, stand, or walk as required; (6) cannot climb a ladder or scaffold ; (7) cannot perform any overhead reaching with weights with the left non-dominant arm ; ( 8) cannot work around any concentrated pulmonary irritants; and (9) cannot operate a foot pedal with his right foot. Record at 74-75. The VE testified that such a person should be able to perform Mr. Cuevas' previous job as a security guard. Record at 75.

The ALJ then modified this hypothetical to add the limitation that the person could not work with the public, could not work closely with others, and could not work as a member of a team in trying to accomplish a particular job task. The VE testified that this new limitation would eliminate the security guard job. Record at 75. He testified, however, that a person with these qualifications could work as a bench assembler, an inspector, a checker or a weigher, a general clerk or helper, or a packer, and that some clerical positions might be an option as well. The VE opined that these positions exist in relative abundance in the Chicago area. Record at 76.

The ALJ then modified the hypothetical to include the limitation that the person needs a cane to walk. The VE testified that this additional limitation would have no impact on

employability. Record at 76.

The ALJ then modified the hypothetical further to add a requirement that the worker change positions every 45 to 60 minutes, and only walk occasionally. The VE opined that an individual with these restrictions could perform sedentary work, like bench assembly, driving an escort vehicle, performing clerical duties, and working as a sedentary inspector, checker or weigher; he further testified that a limited number of these jobs existed in the Chicago area. Record at 77.

Finally, the ALJ asked what would happen if he modified the hypothetical to say that this person must change positions every five to ten minutes and must take one to three naps per day. The VE testified that there is sedentary work where you can sit, stand, and change positions as needed, however needing to take one to three naps a day would eliminate employability. Record at 77.

Mr. Cuevas' attorney asked how pain or any other factor that would affect memory, in terms of being able to follow instructions and complete a task, would affect the hypotheticals posed by the ALJ. Record at 78. The VE testified that any type of unskilled work requires an ability to focus on the task in order to perform the job and respond to supervisors in an appropriate manner throughout the entire workday and week. Thus, the VE testified, if a person is unable to concentrate for any

reason throughout a workday or week, he is unemployable. Record at 78.

In addition to the hearing testimony, the ALJ considered medical records documenting Mr. Cuevas' physical and mental conditions, as well as progress notes and assessments from treating physicians. The documents concerning Mr. Cuevas' physical impairments show that, immediately following his fall, Mr. Cuevas was admitted to Northwestern Memorial Hospital on November 27, 1999 for three days. At that time, he complained of pain in his back, head, neck, and his left wrist, as well as some pain and numbness down his thighs. Record at 220. He also reported having difficulty getting up due to pain. Record at 220.

With respect to Mr. Cuevas' foot and ankle pain, the record shows that Mr. Cuevas suffered a ruptured achilles tendon in 1997 and then had two surgeries performed in 1997 and 1998, to try to repair that injury. Record at 378,416. The record further shows that Mr. Cuevas was able to work, despite that injury, until he fell down the stairs in November 1999. Record at 183. On January 27, 2001, Mr. Cuevas saw Dr. Angelito Bernardo, an internal medicine consultative examiner for the SSA, and complained that he had a problem with his right ankle, and problems with the ligaments on his foot. Record at 277. Dr. Bernardo noted that there was tenderness and swelling on his ankle, involuntary contractions of muscle fibers, and that Mr. Cuevas walked with a

limp due to pain. Record at 279-80.  On March 27, 2001, Mr. Cuevas saw Dr. Gregory Przybylski, a neurosurgeon, who noted physical evidence of Mr. Cuevas foot surgery, notably, that his gait was impaired.

With respect to Mr. Cuevas' left shoulder pain, the record shows that his primary care physician, Dr. Suchat Pong recommended physical therapy two to three times a week that lasted from January to May of 2000. A January physical therapy progress report noted that Mr. Cuevas was unable to work; he could not sit or stand for more than five minutes. Record at 257. A February 2000 physical therapy progress report indicated that Mr. Cuevas was still incapable of working; he could not wash his hair or dress himself without assistance. Record at 254. A progress report dated April 14, 2000 noted that, although the treatment was helping, the results were not as dramatic as the doctors had expected. Record at 247.

Mr. Cuevas began seeing Dr. James Breihan, an orthopedic surgeon, on March 1, 2000, who diagnosed him with a rotator cuff injury and prescribed continued physical therapy with additional ultra sound, and/or electric current treatment.  After two months of treatment, on May 8, 2000, Dr. Breihan gave Mr. Cuevas a steroid injection in his left shoulder. Record at 342.  The injection helped to manage the pain until August 2000, and during this time, Mr. Cuevas had full range of motion, with only mild

discomfort. Record at 340. By January, 27, 2001, during an examination by Dr. Angelito Bernardo, Mr. Cuevas indicated that his shoulder was not bothering him too much. Record at 277. By March 27, 2001, however, when Mr. Cuevas saw Dr. Gregory Przybylski, he reported that, although the pain had subsided somewhat with cortisone injections, it had recently returned. Record at 472.

With respect to his seizure disorder and chronic headaches, the record shows that on April 25, 2000, Mr. Cuevas saw Dr. David Shenker, a neurologist, on referral from Dr. Pong. At that time, Mr. Cuevas reported that he had experienced a seizure on April 1, 2000, and he complained of constant headaches. In a report to Dr. Pong, Dr. Shenker opined that, while Mr. Cuevas may have had a seizure, he could not attribute the seizure to the November 27, 1999 fall, because the fall had apparently caused no severe head injury. Record at 339. Furthermore, Dr. Shenker stated that he had difficulty accounting for Mr. Cuevas' daily complaints of headaches. Dr. Shenker recommended an electroencephalogram ("EEG") and magnetic resonance imaging ("MRI")to attempt to identify the source of his seizures and headaches. Mr. Cuevas had the EEG on May 22, 2000, and the MRI on May 31, 2000. Both tests were normal. Record at 319.

The record shows that, on October 16, 2000, Mr. Cuevas went to see Dr. Ralph Cabin, another neurologist. At that time, Mr.

Cuevas complained of headaches, dizziness, memory loss, and seizures. As a result of his examination, Dr. Cabin diagnosed "post concussion syndrome with headaches, dizziness, decreased memory, and insomnia" and "seizure disorder secondary to the head trauma, " and prescribed Dilantin. Record at 366. Dr. Cabin ordered an EEG, which was performed on October 19, 2000; the result of this EEG was normal, as well. Record at 370. On January 27, 2001, Mr. Cuevas saw Dr. Angelito Bernardo, an internal medicine doctor, and again complained of seizures. Mr. Cuevas told Dr. Bernardo that he could not afford his Dilantin, so he experienced seizures approximately once or twice a week. Record at 277. Dr. Bernardo opined that Mr. Cuevas suffered from grand mal seizures, which are characterized by: 1) shaking all over; 2) stiffening up; 3) rolling eyes; and 4) an occasional loss of his bladder. Record at 277, 280.

With respect to Mr. Cuevas' mental impairments, on December 5, 2000 and December 12, 2000, Dr. Sandra Weintraub, and Dr. Amity Ruth, two psychologists, evaluated Mr. Cuevas on referral from Dr. Wesley Yapor, the doctor who treated Mr. Cuevas at Northwestern immediately after his fall. At that time, Mr. Cuevas complained of trouble remembering conversations and appointments, difficulty paying attention, mild depression and anxiety, irritability and frustration. Record at 468. He also noted sleep difficulties, which he attributed to pain. Record at

468. Drs. Weintraub and Ruth found that Mr. Cuevas was "pleasant and cooperative," showed "good task persistence" and "frustration tolerance." Record at 469. He scored in the "minimally depressed" range on the Beck Depression Inventory, and in the "moderate range" for anxiety. Record at 470.

His performance on the Wide Ranging Achievement Test, 3rd (WRAT-3) showed borderline to below average capabilities in reading, spelling, and math, which was, according to the doctors, consistent with his reported education and occupational history. Record at 469. He demonstrated "mild difficulties on demanding tests of attention, especially when information was lengthy, unrelated, or unstructured." Record at 471. Drs. Ruth and Weintraub opined that Mr. Cuevas' symptoms were "consistent with sequelae related to mild traumatic brain injury, but that they could also be seen with patients having depression, anxiety, or chronic pain"; they noted that "other factors, like sleep problems and pain medications, may further affect Mr. Cuevas' attentional abilities." Record at 471.

Next, the record shows that, on January 30, 2001, Mr. Cuevas was evaluated by Dr. Zulima Hurtado, a psychiatrist, at the request of the Social Security Administration. Mr. Cuevas told Dr. Hurtado that he felt stressed and depressed since his back injury, and that he also felt hopeless, helpless, and worthless. Record at 289-290. Mrs. Cuevas interjected that Mr. Cuevas

14

cannot remember things, that he has crying episodes, irritability, sleeplessness, and loss of appetite. Record at 289-290. Dr. Hurtado concluded that Mr. Cuevas suffered from "marked poverty of speech and content"; his thought processes were significantly delayed, and he had difficulty processing information and retaining information. Record at 292. According to Dr. Hurtado, Mr. Cuevas' mood was "markedly dysphoric," and his affect was "labile and tearful". Record at 292. Dr. Hurtado diagnosed Mr. Cuevas with "dementia due to head trauma" and "personality change due to head trauma of mixed type." Record at 294. In Dr. Hurtado's opinion, Mr. Cuevas required constant supervision: "his mini mental was grossly impaired," and he was "unable to process information, retain information, perform 3 step commands, or perform motor functions." Record at 294. Additionally, she scored him at a 10-20 on the DSM-IV's Global Assessment of Functioning Scale, which indicates (at a range of 1-10), "persistent danger of severely hurting self or others. . .OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death," or (at a range of 10-20), "some danger of hurting self or others. . .OR occasionally fails to maintain minimal personal hygiene. . .OR gross impairment in communication. . ." DIAGNOSTIC AND STATISTICAL

MANUAL OF MENTAL DISORDERS, 32 (4th ed. 1994).[1]  As a result, Dr.
Hurtado concluded that Mr. Cuevas' overall prognosis was "poor."
Record at 294.

Next, the record shows that Mr. Cuevas began seeing Dr. Elie
Mangoubi, a psychiatrist, on March 27, 2001.  On the date of the
first visit, Dr. Mangoubi completed an SSA questionnaire on Mr.
Cuevas' condition. On this questionnaire, Dr. Mangoubi noted that
Mr. Cuevas experienced, among other things, pervasive loss of
interest in almost all activities, appetite disturbance, sleep
disturbance, decreased energy, feelings of worthlessness, and
difficulty concentrating or thinking. Record at 317.    He
concluded that Mr. Cuevas could not perform simple, repetitive
tasks, was mentally unable to concentrate on any one task, and
had marked difficulty in maintaining social function. Record at
318.  His diagnosis at that point was panic disorder or
depression, and he concluded that these impairments affected Mr.
Cuevas' ability to function in a work setting.  Record at 318.

The record shows that on September 14, 2001, Dr. Mangoubi,
who had now been treating Mr. Cuevas every two weeks for about
five months, completed another SSA questionnaire.   On this
questionnaire, Dr. Mangoubi noted the same symptoms as above, but

---

[1] The GAF reports the clinician's judgment of an
individual's overall level of functioning.  It is used in
"planning treatment, measuring its impact, and in predicting the
outcome." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 30 (4th
ed. 1994).

16

added that Mr. Cuevas now felt uncomfortable around people and preferred to be alone. Record at 363. He noted that Mr. Cuevas now experienced panic attacks and /or anxiety attacks three times a week, and that he was on Prozac, Depakote, Trazodone, and Seroquel. Record 363-364. At this time, Dr. Mangoubi diagnosed Mr. Cuevas with post traumatic stress disorder and depression, and concluded that these impairments affected Mr. Cuevas' ability to function in a work setting. Record at 364.

The record shows that, next, Mr. Cuevas saw Dr Norton Knopf, a psychologist, on October 30, 2001, at the request of the Social Security Administration. Dr. Knopf administered the Minnesota Multiphasic Personality Inventory (MMPI), and Mr. Cuevas responded with "no" or "I don't know" to the first 78 items; thereafter, he refused to speak at all, and, when asked about personal things, he occasionally shed tears and complained of pain and being depressed. Record at 480. Dr. Knopf noted that Mr. Cuevas was "uncooperative in the extreme, contrary to the way he had responded to providers in the past." Record at 480. Dr. Knopf reported that, while Mr. Cuevas appeared depressed, he was hesitant to diagnose him as such, given Mr. Cuevas' failure to cooperate. Record at 481.

Finally, with respect to his back problems, the primary cause of his disability, the record shows that, on November 28, 1999, Mr. Cuevas had an MRI at Northwestern Memorial Hospital of

his lumbar spine; The MRI, taken right after his fall, showed disc herniations at the T10-T11, L3-4 and L5-S1 levels. Record at 237. According to the record, at the T10-11 level, there was a moderate sized herniation that "deforms the left ventral aspect of the thecal sac," at the L3-4 disc level, there was "a small central disc herniation, and at the L5-S1 level there was "a moderate sized broad based central disc herniation that mildly deformed the ventral thecal sac, and mild narrowing of the neural foramina bilaterally secondary to a diffusely bulging disc." Record at 238. An MRI of his cervical spine, taken the same day, showed "mild multilevel degenerative disc disease, with the most significant finding at C5-C6 where there is diffuse disc osteophyte complex resulting in mild to moderate central spinal canal narrowing." Record at 239.

The record shows that Dr. Pong also referred Mr. Cuevas to Dr. Breihan for his back problems. Dr. Breihan first examined Mr. Cuevas on March 1, 2000. Record at 346. At that time, Mr. Cuevas complained of lower lumbar back pain. Record at 346. Dr Breihan diagnosed Mr. Cuevas with a thoraco-lumbar injury and recommended "physical therapy for heat and Ultra-sound to the back." Record at 348. Dr. Breihan reported his findings to Dr. Pong, and based on those findings and the progress reports from Mr. Cuevas' physical therapists regarding his shoulder, on March 13, 2000, Dr. Pong opined that Mr. Cuevas was totally disabled

and unable to work until further notice. Record at 266. Dr.
Breihan continued to treat Mr. Cuevas primarily for his other
injuries, but he noted little improvement in Mr. Cuevas' back
condition. Dr. Pong then referred Mr. Cuevas to Dr. Richard
Ressman, a back specialist and orthopedic surgeon.

The record shows that, on July 19, 2000 Dr. Ressman
evaluated Mr. Cuevas on Dr. Pong's referral. Record at 349. At
that time, Mr. Cuevas complained of upper and lower back pain.
Record at 349. After examining Mr. Cuevas, Dr. Ressman noted
"degenerative disc disease in the cervical spine," "disc
herniations at the T10-11, L3-4 and L5-S1 levels," "mild
deformity of T12" and "mild degenerative arthritis." Record at
349 Dr. Ressman indicated that Mr. Cuevas' prognosis was
"guarded" and that an impairment was "probable." Record at 350.
He recommended that Mr. Cuevas consider a myelogram, but thought
he should see Dr. Michael Treister, another orthopedic surgeon,
for a second opinion as to how he should proceed. Record at 349.

Dr. Treister saw Mr. Cuevas two days later, on July 21,
2000. After examining Mr. Cuevas, Dr. Treister noted that "a
major problem is stress incontinence[2] which was never present

---

[2] Stress incontinence is the "involuntary discharge of urine
due to anatomic displacement which exerts an opening pull on
bladder orifice, as in straining/coughing." DORLAND'S ILLUSTRATED
MEDICAL DICTIONARY 659 (26th ed. 1985).

prior the injury and pointed toward a cauda equina injury"[3]; he also noted that Mr. Cuevas reported "burning and aching in the groin which could also be on the basis of a cauda equina injury." Record at 350. Dr. Treister found that Mr. Cuevas' pain was at the dorso-lumbar junction, with some radiation to the bottom of the lumbosacral spine. Record at 350. He also confirmed the compression fracture at T12 and noted that the images suggested that the injury was recent, rather than old. Record at 350. Dr. Treister agreed with Dr. Ressman and recommended a myelogram of the lumbar and thoracic spine, a post myelogram computerized tomography scan, ("CT-scan") and an electromyogram ("EMG"), and he scheduled Mr. Cuevas for the myelogram and CT-scans on August 8, 2000. Record at 351.

The record does not contain a report on any EMG. However, the record does contain a report from Dr. Ralph Cabin, a neurologist, who saw Mr. Cuevas on October 16, 2000 on referral from Dr. Yapor, indicating that Mr. Cuevas had an EMG and that the EMG "revealed bilateral S1 radiculopathy." Record at 365. Dr. Cabin diagnosed Mr. Cuevas with "lumbosacral radiculopathy" (in addition to the post concussion syndrome and seizure disorder noted above) and recommended physical therapy. Record at 366. The

---

[3]The cauda equina is a "collection of nerve roots that descends from the lower part of the spinal cord and occupies the lower third of spinal canal." THE AMERICAN MEDICAL ASSOCIATION ENCYCLOPEDIA OF MEDICINE 244 (Charles B. Clayton ed., 1989).

record does not include reports or results from the myelogram or
CT scans. But the record does include a report from Dr. Gregory
Przybylski, a neurosurgeon who evaluated Mr. Cuevas on March 27,
2001, indicating that Mr. Cuevas had, in fact had the myelogram
and CT-scans done, but that the images from the tests were
unavailable for his review.

Next, with respect to his back, the record shows that, on
January 27, 2001, Mr. Cuevas saw Dr. Bernardo. At that time, Mr.
Cuevas complained that his lower back hurt when he walked, and he
reported that he was taking Piroxicam, as well as Tylenol, to
help with the pain. Record at 277. With respect to his chronic
back pain, Dr. Bernardo noted that Mr. Cuevas had tenderness, as
well as spasms, in the lumbosacral region, with minimal
degenerative changes of the lower lumbar facets, and decreased
range of motion. Record at 280, 284. He also noted a compression
fracture at the T12 vertebral body. Record at 284.

During the examination by Dr. Przybylski, on March 27, 2001,
Mr. Cuevas complained of gradually progressive pain in his spinal
axis, which included headaches, with pain traveling to the mid-
interscapular region. He also complained of significant low back
pain, his most prominent symptom. Record at 472. He stated that
the pain increased with sitting, standing or lying down, and that
it caused him to repeatedly change positions. Record at 472. He
described the pain as throbbing in nature. Record at 472. After

examining Mr. Cuevas, Dr Przybylski found a soft disc herniation eccentric to the left at T10-11, as well as degenerative lumbar disc disease. Record at 473-74. He also found that Mr. Cuevas had multilevel cervical degenerative disc disease and straightening of the normal cervical lordosis, spondylitic disease that was prominent at C5-6 with canal narrowing, and lateral thoracic disc displacement at T10-11 eccentric to the left. Record at 473-74.

Dr. Przybylski concluded that Mr. Cuevas' chronic pain problem was difficult to diagnose, because his symptoms involved the entire spinal axis and could not be localized. Record at 474. Dr. Przybylski concluded that Mr. Cuevas' pain "was likely coming from a combination of deconditioning, and weight gain, as well as inactivity." Record at 474. Despite this conclusion, Dr. Przybylski prescribed Elavil, an anti-depressant, to replace Prozac, and recommended Ultram, a new anti- inflammatory agent. Record at 474.

The record shows that, on May 31, 2001, Mr. Cuevas saw Dr. Jesse Butler, with two primary complaints: (1) lower thoracic discomfort and para-spinal muscle spasms with radiation across to the left chest anteriorly, and (2) mechanical type low back pain that makes it difficult to sit, stand, and perform basic activities of daily living. Record at 327. Dr. Butler concluded that Mr. Cuevas suffered from "cervical C5-6 stenosis," "T11-12

disc herniation on the left side producing thoracic radiculopathy," and "L5-S1 disc degeneration with annular tear and central disc herniation." Record at 328. Dr. Butler determined that "the primary pain generator" was the L5-S1 disc, and recommended "aggressive treatment" for it- " a decompressive laminectomy, diskectomy, posterior spinal fusion, as well as interbody fusion." Record at 328. Mr. Cuevas agreed to the recommended course of treatment. Record at 328.

Mr. Cuevas next saw his primary care physician, Dr. Pong, on July 2, 2001. At that time, Dr. Pong completed an SSA questionnaire, and indicated that Mr. Cuevas had disc herniations at the T10-11, L3/4, L4/5, and L5/S1 levels and an old compression fracture at T12. Record at 322. He noted that Mr. Cuevas had severe pain in his entire lower back and sensory loss and hyporeflexia in his right foot. Record at 322. Along with the questionnaire, Dr. Pong included a note stating that he had diagnosed Mr. Cuevas with (1) disc herniation of the T10-11, L3-4-5 and S1; (2) degenerative osteoarthritis of the left shoulder; (3) compression fracture of the 12th thoracic vertebra; and (4) mental depression. Record at 324. He stated that Mr. Cuevas "is totally disabled" and "not able to do any gainful work." Record at 324.

The ALJ issued her opinion on January 24, 2002, finding that Mr. Cuevas was not disabled and denying his claim for benefits.

23

In particular, the ALJ stated that none of Mr. Cuevas'
impairments, separately or in combination, met or medically
equaled the requirements for one of the impairments listed in
Appendix 1 Subpart P Regulations No.4. Record at 17.
Specifically, the ALJ opined that Mr. Cuevas' depression did not
meet or equal the requirements of section 12.04, as the condition
causes only mild restriction of daily activities, moderate
difficulties in maintaining social functioning, mild difficulties
maintaining concentration, persistence, or pace, and no more than
two episodes of deterioration or decompensation of extended
duration. Record at 17-18.

Moreover, the ALJ noted that, although Mr. Cuevas has severe
medical problems, the inconsistency in his presentation to
examiners suggests that he is exaggerating his symptoms and
limitations. Record at 24. With respect to his mental
impairments, she noted that, although Mr. Cuevas complained of
difficulty with concentration and attention, when engaged in
evaluation, no difficulty had been noted. Record at 18. The ALJ
also referenced the medical expert's testimony, which expressed
doubt as to Mr. Cuevas' various psychological diagnoses of
dementia, post traumatic stress disorder, and depression. Record
at 24. The medical expert testified that there was insufficient
medical evidence to confirm any of these diagnoses, and the ALJ
agreed with that assessment. Record at 24. With respect to Mr.

Cuevas' alleged seizures and headaches, the ALJ noted that, although Mr. Cuevas initially denied sustaining a head injury on his alleged date of onset, he later asserted that he did sustain a head injury, that he lost consciousness and now experiences constant headaches and seizures. Record at 24. The ALJ found this assertion to be incredible. Record at 24. The ALJ further noted that Mr. Cuevas' assertions of how many seizures he experienced were inconsistent, and that he himself admitted that, when he took his medication, the seizures were controlled. Record at 24. With respect to Mr. Cuevas' back problems, the ALJ found that "although scans have shown problems in various areas of the spine, there is no consistency in terms of symptoms and signs." Record at 24. The ALJ therefore concluded that Mr. Cuevas was exaggerating his symptoms. Record at 24.

After assessing his limitations, the ALJ determined that Mr. Cuevas lacked the residual functional capacity to perform his past relevant work, but that he had the ability to do a significant number of jobs in the national economy, including bench assembler, inspector/checker or weigher, general office clerk helper and packer. Record at 25. The ALJ determined, therefore, that Mr. Cuevas was not disabled within the meaning of the social security act.

The ALJ's decision became the final agency decision when the Appeals council denied review on April 18, 2002. Mr. Cuevas then

filed this lawsuit, seeking review of the agency's decision and an award of benefits. The parties consented to proceed before a magistrate judge, and the case was reassigned to this Court on December 2, 2002. Thereafter, both parties moved for summary judgment. Mr. Cuevas asks the Court to reverse the Commissioner's denial of his claim for benefits, or in the alternative, to remand the case to the Commissioner for further proceedings. The Commissioner has filed a cross-motion for summary judgment, asking the court to affirm the ALJ's findings.

## Discussion

Disability Insurance Benefits are available only to claimants who can establish disability under the terms of the Social Security Act. The social security regulations provide a five-step sequential analysis for determining disability for purposes of eligibility for benefits. Under the regulations, the ALJ is required to evaluate, in sequence, (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F. R. part 404 Subpart P Appendix 1; (4) whether the claimant can perform his past work; and (5) whether the claimant is capable of performing work in the national economy. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (citing *Knight v. Chater,* 55 F.3d 309, 313 (7th Cir.

1995)). The claimant bears the burden of proof at steps one through four; at step five, the burden shifts to the Commissioner. *Knight*, 55 F. 3d at 313.

A district court reviewing an ALJ's decision under the above analysis must affirm if the decision is supported by substantial evidence and free of legal error. 42 U.S.C. § 405 (g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Where, however, "the Commissioner's decision lacks evidentiary support, or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940. In the Seventh Circuit, an ALJ must "build an accurate and logical bridge from the evidence to [his] conclusions so that [the Court] may afford the claimant meaningful review of the SSA's ultimate findings." *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th cir. 2003). It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, the Court must remand. *Steele*, 290 F.3d at 941.

Applying the five-step analysis spelled out above, ALJ Dougherty first determined that Mr. Cuevas had not engaged in substantial gainful activity since his alleged onset date. Record at 17. At step two, the ALJ found that Mr. Cuevas suffered from a combination of impairments, (a thoracic lumbar sprain, a herniated lumbar disc, a history of right achilles rupture,

27

possible depression, asthma and obesity) which, though severe, did not meet or medically equal the requirements for one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. Record at 17. As a predicate to her findings at step four and five, the ALJ determined that Mr. Cuevas could perform a range of light work. Record at 18. Specifically, the ALJ found that Mr. Cuevas could lift 20 pounds occasionally and 10 pounds frequently, and sit, stand, or walk as required, but that he could not climb ladders or scaffolds, perform overhead reaching with weights with his left arm, work around concentrated pulmonary irritants, operate foot pedals with his right foot, or work with the public or closely with others. Record at 18. Based on that assessment, the ALJ concluded that Mr. Cuevas could not perform his past relevant work as a maintenance worker, pest control worker, or security guard. Record at 25. The ALJ concluded, however, that a significant range of light work existed for Mr. Cuevas in the national economy, and he was therefore, not disabled and not entitled to benefits. Record at 25.

Mr. Cuevas argues that the ALJ's decision must be reversed or remanded for four reasons: (1) the ALJ failed to adequately explain her credibility determination with respect to his physical ailments; (2) the ALJ failed to consider the evidence concerning the impact that pain from his ailments had on his life

and on his ability to work; (3) in finding that his impairments did not meet or equal a listed impairment, the ALJ failed to consider all of his impairments, separately and together, and she failed to consider what effect his obesity may have had on his ability to work; and (4) in finding that a substantial number of jobs were available in the national economy, the ALJ failed to consider his visual limitations. The Court will address each argument in turn.

Mr. Cuevas first argues that the ALJ's credibility findings were inadequate. The Court agrees. Although the ALJ thoroughly explained why she was being dismissive with respect to Mr. Cuevas' various mental impairments, she did not do so with respect to his physical impairments. As Mr. Cuevas correctly points out, if an ALJ relies on inconsistencies in the evidence to find a claimant to be not credible, she must specifically detail those inconsistencies, and if she does not, her decision cannot be upheld. *Zurawski v. Halter,* 245 F.3d 881, 887 (7th cir. 2001). Here, the ALJ spent seven pages of her decision outlining Mr. Cuevas' various physical ailments, then she dismissed them out of hand, stating that, "although scans have shown problems in various areas of the spine, there is no consistency in terms of symptoms and signs." Record at 24. The ALJ never fully discussed the perceived inconsistencies; nor did she detail or explain what evidence she relied on in rejecting the claim, or

discuss the evidence favoring Mr. Cuevas on the issue. And she should have. *See Zurawski,* 245 F.3d at 888.

For example, apparently to buttress her assertion that Mr. Cuevas exaggerated his symptoms, the ALJ noted that he arrived at the hearing walking with a cane, though the record contained no indication that he needed one. Record at 24. In fact, the ALJ was wrong on this issue; Dr. Pong specifically opined that Mr. Cuevas needed a cane to get around, and the record includes a copy of Dr. Pong's prescription for a "walking cane." Record at 322, 325. The ALJ also cites Exhibit 24F, Dr. Przybylski's report, as evidence of inconsistency and variability in Mr. Cuevas' performance on tests for positive distraction signs and straight leg raising. But exhibit 24F does not appear to mention distraction signs and it does not appear to reveal any variability in straight leg raising performance. The ALJ also found evidence in the record that Mr. Cuevas had reported "feeling better overall" on June 12, 2001. Record at 23. But the doctor's notes which the ALJ cites to support this statement are difficult to decipher, and the note could just as easily be read to say, "patient not better." Record at 326. Finally, the ALJ noted that Dr. Breihan said he was no longer treating Mr. Cuevas' back injury, suggesting that the back injury had resolved. But, in fact, Mr. Cuevas had simply switched to other specialists, Dr. Ressman and Dr. Treister, in a further attempt

30

to relieve his back pain. Record at 20.

The ALJ explained her credibility finding with respect to Mr. Cuevas' mental impairments; specifically, she explained that she was relying, at least in part, on the testimony and opinions of Dr. Schiff, the medical expert, who questioned these diagnoses for various reasons. One might assume that the ALJ relied upon the testimony of Dr. Schiff in making credibility determinations on the physical impairments as well. But, Dr. Schiff discounted Mr. Cuevas' mental impairments only; he did not discuss inconsistencies or any other issues with regard to Mr. Cuevas' physical impairments, and the record contains a plethora of objective evidence detailing Mr. Cuevas' physical ailments. The ALJ does not appear to have examined this evidence, at least not in a way that allows the court to understand and evaluate how she arrived at her findings with respect to his physical impairments. "'[A]n ALJ may not ignore an entire line of evidence that runs contrary to her findings,'. . . rather she must 'articulate at some minimal level [her] analysis of the evidence' to permit an informed review." *Zurawski,* 245 F.3d at 888 (quoting *Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999); *Clifford*, 227 F.3d at 872).

Having said all of this, the Court notes that, at the end of the day, the ALJ's assessment of Mr. Cuevas' credibility with respect to his physical ailments may be accurate. But without a

broader evaluation and a thorough examination of evidence in the record, this Court lacks a sufficient basis to sustain the ALJ's credibility determinations on Mr. Cuevas' physical disabilities.

Mr. Cuevas next argues that the ALJ's decision should be reversed or remanded because she failed to address his allegations concerning his pain, the resulting fatigue and loss of concentration, and because she failed to consider whether, and to what extent, his pain would affect his ability to hold down a job. Again, the Court agrees.

Severe pain can be totally disabling. *Carradine v. Barnhart,* 360 F.3d 751, 754 (7th Cir. 2004). Where medical signs and findings reasonably support a claimant's complaint of pain, the ALJ cannot merely ignore the claimant's allegations. *Zurawski,* 245 F.3d at 887-88. Furthermore, "the absence of significant findings upon diagnostic testing and physical examination," does not necessarily equate with the absence of pain, which can be partly or wholly psychological in origin. *Carradine,* 360 F.3d at 755. That is, the absence of objectively identifiable physical ailments does not disprove a claimant's pain allegations. As Judge Posner noted in *Carradine,* the severity level of one's pain can transcend the diagnostic findings of the significant psychological component of pain. *Id.* at 755.

At the hearing before the ALJ, Mr. Cuevas testified that he

suffers from chronic pain, which on a scale of one to ten, is a six or seven at its best, and a nine at its worse. Record at 40. Mr. Cuevas sought treatment for his pain from three orthopedic surgeons, two neurologists, and a neurosurgeon. In order to diagnose and treat Mr. Cuevas, these various doctors ordered X-rays, MRIs, EEGs, an EMG, and CT scans, and they prescribed a plethora of prescription drugs to try to alleviate his suffering. Notably, even Dr. Przybylski, the physician who found Mr. Cuevas' chronic pain problem difficult to diagnose, and whose opinion the ALJ interpreted as suggesting that Mr. Cuevas was exaggerating, nonetheless recommended Ultram, a prescription anti-inflammatory drug. Record at 474. Furthermore, Mr. Cuevas underwent months of physical therapy, and endured at least one steroid injection to try to combat his pain. Record at 342. Given all of this, the ALJ was, at a minimum, required to address the question of his pain--its severity and the extent to which it might impact his ability to work. To the extent the ALJ dismissed his pain allegations because she did not believe his testimony or because she believed that he exaggerated his symptoms, she was required to explain her reasoning. And to the extent she discounted his pain allegations because she did not think the physical ailments evidenced in the record supported those allegations, *Carradine* instructs that that was improper.

Moreover, Social Security Ruling 96-7p lists several factors

that an ALJ is supposed to consider when addressing issues of pain. The list includes: (1) plaintiff's activities of daily living; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate or aggravate the symptoms; (4) what medications plaintiff takes to alleviate pain or other symptoms, in what dosage, and with what effectiveness and side effects; (5) what treatment, other than medication, plaintiff undergoes or has undergone to alleviate pain or other symptoms; (6) measures other than treatment plaintiff uses or has used to relieve pain or other symptoms; and (7) other factors concerning plaintiff's functional limitations and restrictions due to pain or other symptoms. The ALJ does not appear to have considered any of these factors, some of which clearly would have weighed in Mr. Cuevas' favor, and she should have. *See Noyd v. Barnhart,* No. 01 C 15, 2002 WL 1559708, at *17 (N.D. Ill. July 12, 2002).

Not only did the ALJ fail to address the important issue of pain, she also failed to address the effects of Mr. Cuevas' pain, which similarly impact his ability to work. Mr. Cuevas testified that he is able to sleep only about 3 hours a night because of his pain, which wakes him up and requires him to move around. Record at 42. He testified that, during the day, he experiences pain and fatigue, and needs to take one- to two-hour naps two to three times a day. Record 41-42. This evidence is unrebutted in

34

the record. And the VE testified that, if Mr. Cuevas really
needed to take one to three naps a day, he could not work in any
job. Record at 77.  To the extent she chose not to address the
issues of pain and naps because she found Mr. Cuevas' testimony
on these issues to be incredible, the ALJ was required to explain
her reasoning.  An ALJ may not ignore evidence that is contrary
to her ultimate conclusion, her decision must be based on all the
evidence; "this is especially true when she solicits the
testimony and opinions of a VE at step 5, and then disregards
this testimony without any explanation." *Sayles v. Barnhart,* No.
00 C 7200, 2001 WL 1568850, at *9 (N.D. Ill. Dec. 7, 2001).

Nor does the ALJ appear to have considered the evidence
concerning Mr. Cuevas' limited concentration abilities. She
acknowledged that Mr. Cuevas complained of difficulty with
concentration and attention, but noted that, when he was engaged
in evaluation, no difficulty had been noted.  Record at 18.
First, this was not supported in the record.  On the contrary,
all of the doctors who treated Mr. Cuevas for his mental
impairments noted his difficulty with concentration. And in fact,
the doctors' reports get progressively worse on this issue. In
December 2000,  Drs. Weintraub and Ruth opined that Mr. Cuevas
had functional memory problems  and difficulties on demanding
tests of attention; they further concluded that his deficient
attentional abilities could be further aggravated by his pain

35

medicine and sleep problems. Record at 471. On January 30, 2001, Dr. Hurtado found that, Mr. Cuevas' memory was impaired and that he was unable to process and retain information. Record at 294. Thereafter, Dr. Mangoubi, who treated Mr. Cuevas twice a week for five months beginning in March 2001, reported that Mr. Cuevas had: (1) deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in a work setting or elsewhere); (2) repeated episodes of deterioration or decompensation in work or elsewhere which caused him to withdraw from that situation or to experience exacerbation of signs and symptoms; and (3) mental impairments that prevent Mr. Cuevas from doing simple, but repetitive tasks at work. Record at 363-64. Dr. Mangoubi also found that Mr. Cuevas was unable to stick to any given task. Record at 364.

Second, the VE testified that any type of unskilled labor requires an ability to focus on the task in order to perform the job and to respond to supervisors in an appropriate manner through an entire workday and a work week; if one cannot concentrate on a task for any reason throughout a workday or a work week, according to the VE, he is unemployable. Record at 78. This testimony is unrebutted in the record, and the ALJ was required to explain how, given the evidence in the record, Mr. Cuevas could have performed the various jobs she identified in her decision. To the extent the ALJ found conflicting evidence

36

in the record suggesting that Mr. Cuevas' concentration abilities, etc. were intact, she should have discussed the conflict and explained why she chose one set of evidence over the other. *See Scott v. Barnhart,* 297 F.3d 589, 596 (7th Cir. 2002), (holding that an ALJ must "consider [claimant's] proffered medical evidence and articulate specific reasons for accepting or rejecting it."). She did not do so.

Although an ALJ's credibility determinations are generally entitled to substantial deference, that is only true when the ALJ explicitly makes findings and explains them in a way that affords meaningful review. *Steele v Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002). Here, the ALJ did not do so. In her decision, the ALJ did not specifically discuss the evidence about Mr. Cuevas' napping or his concentration limitations. The Court recognizes that valid reasons may exist for the ALJ to discredit Mr. Cuevas' pain testimony, his testimony concerning his need to nap, and the evidence concerning his ability to concentrate. And, although the ALJ is free to disbelieve Mr. Cuevas, she must explicitly explain why she is doing so. Indeed, it is not "merely helpful for the ALJ to articulate reasons for crediting or rejecting particular sources of evidence, it is absolutely essential for meaningful appellate review." *Zblewski v. Schweiker,* 732 F.2d 75, 78-79 (7th Cir. 1983) The ALJ discussed Mr. Cuevas' credibility with respect to his mental impairments, and thoroughly explained why

37

she was rejecting Mr. Cuevas' complaints with regard to his alleged seizure disorder, depression, post traumatic stress disorder, and dementia. Record at 24. Thus, she clearly knew how to properly address credibility issues, yet, she did not discuss his testimony with respect to his pain, including the severity and the effect it had on his life. Accordingly, the Court has no way to review meaningfully the ALJ's determinations on these issues.

Mr. Cuevas next argues that the ALJ's findings at step three were insufficient. Specifically, he argues that, although the ALJ discussed his depression and explained why it did not meet or equal a listed impairment, she did not do the same with respect to his other impairments. She did not, for example, discuss whether Mr. Cuevas' ankle condition may have met the requirements of listing 1.02; whether his spinal injuries may have met the listing for 1.04; and she did not discuss the effect his obesity may have had on his various ailments. This is true. The ALJ listed Mr. Cuevas' impairments – thoracic lumbar sprain, herniated lumbar disc, history of right achilles rupture, possible depression, asthma and obesity – and concluded that they did not meet or medically equal the requirements for one of the ailments recognized in Appendix 1, Subpart P, Regulations No. 4. Record 17. She then explained how his depression fell short of the mark, but she did not do the same with respect to his other

impairments. Her failure to discuss or cite relevant listings, combined with her limited analysis of the one she did discuss, prevents any meaningful review of her findings at step three, and makes remand the appropriate course of action. *See Brindisi ex rel Brindisi v. Barnhart,* 315 F.3d 783, 786 (7th Cir. 2003).

As a tangent to his argument about the ALJ's step three findings, Mr. Cuevas argues that the ALJ failed to consider his obesity at step five. The Court notes that, because she found that one or more of Mr. Cuevas' impairments was severe, the ALJ was required to consider the aggregate effect of his impairments. *Golembiewski v. Barnhart,* 322 F.3d 912, 918 (7th Cir. 2003). Thus, to the extent the medical evidence warrants, the ALJ should consider the impact of obesity at step five.

Finally, Mr. Cuevas argues that the case should be remanded because the ALJ failed to consider his visual impairments when determining whether he was disabled. The record, however, contains minimal evidence of a visual impairment and no evidence that Mr. Cuevas ever complained of or sought treatment for any problem with his vision. Nor does the record contain evidence suggesting that this was an issue his doctors ever addressed. The Court would, therefore, be hard pressed to fault the ALJ for failing to mention the issue.

## Conclusion

For the reasons set forth above, the Court finds that the ALJ failed to build an accurate and logical bridge between the record evidence and her ultimate conclusion that Mr. Cuevas is capable of performing a substantial number of jobs in the national economy. The Court further finds that the ALJ failed to articulate how she arrived at the conclusion that Mr. Cuevas' impairments – whether separately or when taken together – did not meet or equal a listed impairment. Accordingly, the Court finds that the case must be remanded, and therefore, grants Mr. Cuevas' Motion for Summary Judgment and denies the Commissioner's Motion for Summary Judgment. The matter is remanded to the Commissioner for further proceedings consistent with this opinion.

Dated:    July 14, 2004

ENTER:

ARLANDER KEYS
United States Magistrate Judge